CENTER FOR DISABILITY ACCESS
Raymond G. Ballister, Jr. SBN 111282
Mark Potter, SBN 166317
Phyl Grace, Esq. SBN 171771
Mail: PO Box 262490
    San Diego, CA 92196-2490
Delivery: 9845 Erma Road, Suite 300
    San Diego, CA 92131
(858) 375-7385; (888) 422-5191 fax
Phylg @ potterhandy.com
    Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Samuel Love**, | **Case No.** 5:15-CV-00002-JGB-SP |
| Plaintiff, | **Reply Brief in Support of the Plaintiff's Motion for An Award of Attorney's Fees and Litigation Expenses** |
| v. | |
| **Guillermo Ocampo; Rebeca Ocampo;** and **Gibson Brothers Janitorial Service, Inc.,** a California Corporation, | Date:    December 7, 2015<br>Time:    9:00 a.m.<br>Ctrm:    1 |
| Defendants. | Honorable Judge Jesus G. Bernal |

1
2

# TABLE OF CONTENTS

3   I.  RELEVANCE OF SERIAL LITIGATION ....................................... 1

4       A.   Serial Litigation is a Legitimate Method of Enforcement.................. 2
5
6       B.   The Plaintiff's "Motives" Are Irrelevant ............................... 4

7       C.   Litigation History is not a Valid Legal Basis to Challenge the
8            Plaintiff's Credibility or Diminish Rights ................................. 6

9       D.   Plaintiff's Attorneys Act Properly in Representing the Plaintiff ...... 11

10  II.  THE DEFENSE FAILS TO IDENTIFY ANY BASIS TO REDUCE
11       THE REQUESTED HOURLY RATES ................................. 12

12      A.   Market Rates ............................................................... 12
13
14      B.   Defense Counsel's Fees ................................................ 13

15      C.   Boilerplate Material .................................................... 14

16  III.  THE DEFENSE ARGUMENT ABOUT PROPORTIONALITY HAS
17        BEEN REJECTED BY THE COURTS ................................. 14

18  IV.  THERE IS NO BASIS FOR A NEGATIVE MULTIPLIER........................ 15
19
20  V.  THE DEFENSE CRITICISMS OF INDIVIDUAL BILLING ENTRIES
21       LACK MERIT ............................................................. 18

22      A.   Prefiling Meeting with the Client ..................................... 18

23      B.   Site Inspection .......................................................... 18

24      C.   Public Records Research................................................. 19
25
26      D.   Discovery ................................................................. 21

27      E.   Opposing the Application for Stay ..................................... 21

28      F.   Declarations of Witnesses .............................................. 22

i

G.    Legal Briefs.............................................................................22

H.    Plaintiff's Fee Motion...........................................................23

I.    Reply Brief ..............................................................................23

VI.  CONCLUSION .......................................................................24

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Access 4 All, Inc. v. Boardwalk Regency Corp.,*

4

  2012 WL 3627775 (D.N.J. 2012) ............................................................9

5

*Antoninetti v. Chipotle Mexican Grill, Inc.,*

6

  614 F.3d 971 (9th Cir. 2010) ...................................................... 2, 8

7

*Blackwell v. Foley,*

8

  724 F. Supp. 2d 1068 (N.D. Cal. 2010)............................................ 15

9

*Chabner v. United of Omaha Life Ins. Co.,*

10

  1999 WL 33227443 (N.D. Cal. 1999)............................................ 14

11

*Chambers v. Baltimore & Ohio R.R. Co.,*

12

  207 U.S. 142 (1907).................................................................................8

13

*City of Riverside v. Rivera,*

14

  477 U.S. 561 (1986) ........................................................................... 14

15

*D'Lil v. Best W. Encina Lodge & Suites,*

16

  538 F.3d 1031 (9th Cir. 2008) ................................................. 3, 8, 9, 10

17

*Daniels v. Arcade, L.P.,*

18

  477 F. App'x 125 (4th Cir. 2012) ............................................................8

19

*Feezor v. Chico Lodging, LLC,*

20

  422 F. Supp. 2d 1179 (E.D. Cal. 2006) .................................................5

21

*Gomez v. Gates,*

22

  804 F.Supp. 69 (C.D. Cal. 1992)...................................................... 16

23

*Hansen v. Deercreek Plaza, LLC,*

24

  420 F.Supp.2d 1346 (S.D. Fla. 2006).............................................. 11

25

*Hansen v. Deercreek Plaza, LLC,*

26

  420 F.Supp.2d 1346 (S.D.Fla 2006) ................................................. 13

27

*Hensley v. Eckerhart,*

28

  461 U.S. 424 (1983) .....................................................................15, 16

iii

1  *Hoewischer v. Sailormen, Inc.,*
2      2012 WL 2865788 (M.D. Fla. 2012) ..........................................................8
3  *Johnson v. Georgia Highway Express, Inc.,*
4      488 F.2d 714 (5th Cir. 1974) ............................................................ 15
5  *Kalani v Castle Village, LLC,*
6      13 F.Supp.2d 1359 (E.D. Cal, 2014) ............................................... 11
7  *Kittok v. Leslie's Poolmart, Inc.,*
8      687 F. Supp. 2d 953 (C.D. Cal. 2009) ...................................................1
9  *Kittok v. Leslie's Poolmart, Inc.,*
10     687 F. Supp. 2d 953 (C.D. Cal. 2009) ...................................................8
11 *Los Angeles Cnty. Metro. Transp. Auth. v. Superior Court,*
12     123 Cal. App. 4th 261 (2004) ...................................................................4
13 *Margolin v. Regional Planning Comm'n,*
14     134 Cal.App.3d 999 (1982) ................................................................ 13
15 *Molski v. Evergreen Dynasty Corp. II,*
16     521 F.3d 1215 (9th Cir. 2008) ......................................................... 6, 7
17 *Molski v. Evergreen Dynasty Corp.,*
18     500 F.3d 1047 (9th Cir. 2007) ................................................................2
19 *Molski v. M.J. Cable, Inc.,*
20     481 F.3d 724 (9th Cir. 2007) ......................................................... 10, 11
21 *Morales v. City of San Rafael,*
22     96 F.3d 359 (9th Cir.1996) ................................................................ 15
23 *Parr v. L & L Drive-Inn Restaurant,*
24     96 F.Supp.2d 1065 (D. Hawaii  2000) ...................................................2
25 *PLCM Group, Inc. v. Drexler,*
26     22 Cal.4th 1084 (2000) ...................................................................... 12
27 *Ramirez v. Sam's for Play Cafe,*
28     2013 WL 4428858 (N.D. Cal. 2013) ......................................................8

Motion for Attorney's Fees: Reply                **Case No.** 5:15-CV-00002-JGB-SP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Segal v. Rickey's Rest. & Lounge, Inc.*,

 2012 WL 2393769 (S.D. Fla. 2012) ......................................................8

*Turner v. Ass'n of Am. Med. Colleges*,

 193 Cal. App. 4th 1047 (2011)..............................................................5

*United Steelworkers of Am. v. Phelps Dodge Corp.*,

 896 F.2d 403 (9th Cir. 1990) ............................................... 13

*Walker v. Carnival Cruise Lines*,

 107 F.Supp.2d 1135 (N.D. Cal. 2000) ....................................2

*Welch v. Metropolitan Life Ins. Co.*,

 480 F.3d 942 (9th Cir. 2007) ............................................... 13

*Wilson v. Murillo*,

 163 Cal.App.4th 1124 (2008) ..............................................7

**Statutes**

28 C.F.R. § 36.403(b) ...................................................... 20

28 C.F.R. § 36.403(f) ....................................................... 20

28 C.F.R. § 36.403(f)(1) ................................................... 20

42 U.S.C. § 12183(a)(2).............................................19, 20

Cal. Gov't Code § 8299 ......................................................4

v

## I.   RELEVANCE OF SERIAL LITIGATION

The defense bases much of its opposition on the fact that the plaintiff is a serial litigator, i.e., has prosecuted a number of ADA cases. The defense claims that the courts in this district have "identified and harshly commented on the scheme that this Plaintiff and his counsel conduct" to "bilk small businesses" and that the Ninth Circuit has found "similar litigators to be vexatious." Defense Brief, p. b, lines 17-21. The defense then claims that this is a basis to reduce fees. *Id.* at lines 22-23. In fact, the defense has an argument titled, "Relevance of Multiple Lawsuits" (*id.* at p. 1, line 23) and, later, goes so far as to claim that plaintiff's counsel has a reputation by the courts as "unscrupulous" and that plaintiff's counsel's lawsuits have been "described by the justices of this Circuit as schemes." *Id.*  at p. 8, lines 18-21.

This is simply outrageous and should not be tolerated by this Court. The defense does not cite to the courts, court decisions or justices that have referred to plaintiff's attorneys as unscrupulous or running a scheme. It is a bald face lie. In one of the last cases where a defense attorney made similar comments about plaintiff's attorneys, the district court held: "These arguments are representative of a troubling trend in which disability access defendants attack the motives of plaintiffs and their counsel in nearly every case brought to enforce the right to equal access guaranteed by the ADA and California statutes." *Kittok v. Leslie's Poolmart, Inc.*, 687 F. Supp. 2d 953, 958 (C.D. Cal. 2009). The defense simply does not know what it is talking about. It cites a couple of 2004 decisions at the district level and treats this as established jurisprudence.

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

**A.      Serial Litigation is a Legitimate Method of Enforcement**

Serial litigation, *i.e.*, multiple lawsuits brought by a single plaintiff, is a legitimate method of enforcing the law. The courts that have seriously grappled with the issue have concluded that there is nothing inherently wrong with serial litigation and, in fact, it serves a public good. Citing to Supreme Court precedence, one federal court noted, "successful ADA plaintiffs confer a tremendous benefit upon our society at large in addition to the attainment of redress for their personal individual injuries...the enforcement of civil rights statutes by plaintiffs as private attorneys general is an important part of the underlying policy behind the law." *Walker v. Carnival Cruise Lines*, 107 F.Supp.2d 1135, 1143 (N.D. Cal. 2000) (the "benefits of such changes clearly redound not only to the plaintiffs themselves, but to similarly situated disabled persons, and the entire society at large. As a result, plaintiffs or plaintiff classes who bring suit pursuant to the ADA do so in the role of private attorneys general who seek to vindicate a policy of the highest priority.").

"Civil rights law depends heavily on private enforcement." *Parr v. L & L Drive-Inn Restaurant*, 96 F.Supp.2d 1065, 1082 (D. Ha. 2000). In fact, private serial litigation is the cornerstone of ADA enforcement. The Ninth Circuit has acknowledged – in multiple published opinions – that most ADA lawsuits are brought by a small number of private plaintiffs who view themselves as champions of the disabled, and "for the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serials litigation advancing the time when public accommodations will be compliant with the ADA." *See*, *e.g. Antoninetti v. Chipotle Mexican Grill, Inc.*, 614 F.3d 971, 980 (9th Cir. 2010), quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007) ("Evergreen"), and

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

1   Samuel R. Bagnestos, The Perversity of Limited Civil Rights Remedies:
2   The Case of "Abusing" ADA Litigation, 54 UCLA L. Rev. 1, 5 (2006);
3   accord, *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th
4   Cir. 2008) (quoting same) ("The attempted use of past litigation to
5   prevent a litigant from pursuing a valid claim in federal court warrants
6   our most careful scrutiny."). The Eleventh Circuit also recently
7   commended a plaintiff for his litigation activities: "We again commend
8   plaintiff's effort to enforce the ADA on behalf of the [disability]
9   community. As the statute is written, private citizens bear the brunt of the
10  enforcement burden, and Mr. Gomez is doing his part." *Gomez v. Dade*
11  *Cnty. Fed. Credit Union*, 619 Fed.Appx. 859, 865 (11th Cir. 2015).

12      The United States Department of Justice shares this view, and has
13  even gone so far as to express support for serial ADA litigants. As the
14  Department of Justice wrote in its amicus curiae brief in the *en banc*
15  hearing of *Chapman v. Pier 1 Imports (U.S.), Inc.*:

16      Private plaintiffs play an important role in enforcing the
        ADA, particularly in the area of public accommodations,
17      which includes a large number of entities. The United States
        could not investigate every place of public accommodation
18      in the country to determine if it is in compliance with the
        ADA. Effective enforcement of Title III, therefore, *depends*
19      upon a combination of suits by the United States and
        litigation by individuals with disabilities who are aware of
20      and encounter violations in their local communities.

21

22  Brief for the United States as Amicus Curiae on Rehearing En Banc,
23  *Chapman v. Pier 1 Imports (U.S.), Inc.*, Circuit Case No. 07-16326 (March
24  5, 2010), at p. 2, reprinted 2010 WL 767027, at *2.

25      Not only does the Department of Justice believe that private
26  litigants are essential for enforcement of the ADA, but the California
27  Legislature feels the same way. When California recently passed the
28  Construction-Related Accessibility Standards Compliance Act, it

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

1   specifically found that despite the passage of the ADA and the 1992
2   amendments to the Unruh Act "persons with disabilities are still being
3   denied full and equal access to public facilities in many instances." Cal.
4   Gov't Code § 8299. The final Senate analysis of S.B. 1608 further noted
5   that "there is so little, if any, public prosecution of access violations, that
6   thus private enforcement efforts are central to the means by which these
7   laws, like other civil rights laws, are designed to be enforced." S. B. 1608
8   Senate Bill Analysis at 4 (Aug. 28, 2008).

### B.   The Plaintiff's "Motives" Are Irrelevant

11      The defense argument is that the plaintiff is actively engaged in
12   serial litigation to line his own pockets with the statutory penalties
13   available under the Unruh Civil Rights Act and, therefore, his claims
14   should be looked at with skepticism and he should be punished in some
15   fashion. This argument should be rejected for several reasons. First, of
16   course a serial litigator is motivated by the right to recover statutory
17   penalties. That is the *very purpose* of statutory penalties:

> It is apparent from this legislative history that section 52 has
> at least two important non-punitive purposes. The first is
> simply to provide increased compensation to the plaintiff.
> The second purpose, and perhaps the more important one, is
> *to encourage private parties* to seek redress through the civil
> justice system by *making it more economically attractive for
> them to sue.*

*Los Angeles Cnty. Metro. Transp. Auth. v. Superior Court*, 123 Cal. App. 4th
261, 270-71 (2004) (emphasis added). "Moreover, the inclusion of
penalties and damages is the driving force that facilitates voluntary
compliance with the ADA." *Parr*, 96 F.Supp.2d at 1082. Thus, the fact
that the plaintiff is motivated by the right to recover statutory penalties is
not an *abuse* of the law, it is the intended function of the law. Likewise, the

4

existence of one-way fee shifting provisions are designed specifically to "encourage *vigorous* enforcement of the Unruh Act" by providing penalties and one-way fee shifting. *Turner v. Ass'n of Am. Med. Colleges*, 193 Cal. App. 4th 1047, 1063-64 (2011). In fact, the *Turner* court conducted some in-depth legislative history analysis and concluded that the one-way fee shifting entitlement given to persons with disabilities, but denied to prevailing defendants, was:

> [C]reated by legislators as a deliberate stratagem for advancing some public purpose, usually by encouraging more effective enforcement of some important public policy. In particular, such provisions reflect the Legislature's intent to encourage injured parties to seek redress—and thus simultaneously enforce public policy—in situations where they otherwise would not find it economical to sue.

*Id.* at 1060 (internal cites and quote marks omitted).

The court in *Feezor v. Chico Lodging, LLC*, 422 F. Supp. 2d 1179 (E.D. Cal. 2006) reached the same conclusion. The court was faced with a standing challenge and an attack on the plaintiff's credibility because the plaintiff had filed numerous other cases. The Court rejected the implication and stated, "The fact that plaintiff is fulfilling the Congressional purpose when it provided for private enforcement of the ADA is hardly evidence of bad faith." *Id.* at 1181.

Second, the plaintiffs' motivation is not singular. As a profoundly disabled paraplegic, the prosecution of these cases promote the plaintiff's personal right to full and equal access and work a direct benefit to him. So, while the recovery of penalties is a motivating factor, forcing a business to remove unlawful barriers to access is another motivation. The fact that there are dual motivations resulting in serial litigation does not suggest that the claims are invalid or fabricated: "while self-interest surely drives serial access litigation in part, the reason there can be so

5

many lawsuits about access to public accommodations is that there are so many violations of the laws that seek to assure access, and so many disabled people are thwarted from participating equally in the activities of everyday life." *Molski v. Evergreen Dynasty Corp. II*, 521 F.3d 1215, 1220 (9th Cir. 2008).

Finally, if the plaintiff's complaints are valid, *i.e.*, if the defendants are in violation of the law, why would the plaintiff's internal motives be relevant as a matter of law? While serial litigation has proven to be provocative, even controversial, it is a matter of perspective. Consider one thought experiment used by the Department of Justice in the oral arguments in *Miller v. California Speedway*, 536 F.3d 1020 (9th Cir. 2009): If an African-American man moved to a southern town where the majority of the local businesses displayed signs, "no blacks allowed" or "blacks enter in the back," no one would object (except the businesses themselves) if that man *sued all of those businesses*. In fact, we would applaud his effort to haul all of those law-breaking businesses into court and seek penalties and injunctive relief. Yet, if a profoundly disabled person, a quadriplegic for example, sues scores of businesses in the counties where he lives and travels for violating disability civil rights laws, folks have no hesitation to label him an agitator, an abuser of the law, and subject him to a host of other derogatory character attacks.

## C.   Litigation History is not a Valid Legal Basis to Challenge the Plaintiff's Credibility or Diminish Rights

It is, perhaps, understandable to have a knee-jerk reaction that would lead one to suspect inappropriate behavior by a plaintiff filing an avalanche of lawsuits. But this initial concern cannot withstand serious scrutiny given the fact that these businesses are *actually in violation* of the law. The number of disability access lawsuits filed by an individual

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

plaintiff is not evidence of abuse. *Wilson v. Murillo*, 163 Cal.App.4th 1124, 1128, fn. 3 (2008). The *Wilson* Court's holding on this issue is applicable in the present case:

> While Wilson obviously views himself as a champion of the disabled, he is condemned by Murillo as a serial litigant who exploits the ADA by filing lawsuits with "a clear intent to harass businesses and extort quick cash settlements...." Wilson does not dispute that he has filed many ADA access lawsuits. Numerosity alone, however, is insufficient to show that his lawsuits are frivolous or harassing. One court has examined the contents of Wilson's filings and has made an express finding that his ADA claims are not frivolous and that he is not a vexatious litigant. "From all that appears, the number of lawsuits [Wilson] has filed does not reflect that he is a vexatious litigant; rather, it appears to reflect the failure of the defendants to comply with the law." (*Wilson v. Pier I Imports (US), Inc.* (E.D.Cal.2006) 411 F.Supp.2d 1196, 1200.) This difference in points of view being noted, we emphasize that Wilson's **litigation history is immaterial to our resolution of this case**.

*Id.* at 1128, fn. 3 (emphasis added). "[T]he phenomenon [multiple filings] is a creature of our federal and state statutes and cannot justify the issuing of prefiling orders that enjoin meritorious lawsuits."*Molski v. Evergreen Dynasty Corp. II*, 521 F.3d 1215, 1220 (9th Cir. 2008). The "simple fact that a plaintiff has filed a large number of complaints" or the "textual and factual similarity of a plaintiff's complaints" is "not a basis" for finding that the plaintiff is involved in vexatious litigation. *Molski Evergreen Dynasty Corp. I*, 500 F.3d 1047, 1061 (9th Cir. 2007).

The sheer fact that a plaintiff has an extensive litigation history is simply not relevant to credibility or to an assessment of his case. "The attempted use of past litigation to prevent a litigant from pursuing a valid claim in federal court warrants our most careful scrutiny. This is particularly true in the ADA context . . . [a]ccordingly, we must be particularly cautious about affirming credibility determinations that rely on a plaintiff's past ADA litigation." *D'LiL v Best Western Encina*, 538 F.3d

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

1031, 1040 (9th Cir 2007). It would be a different story if the plaintiff has a history of *frivolous* or *abusive* cases. "The right to sue and defend in the courts ... is one of the highest and most essential privileges of citizenship ... [and] is granted and protected by the Federal Constitution." *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907). "Absent a determination that [plaintiff] has abused those privileges, we will not hold his past participation in the judicial process against him. Accordingly, we conclude that [plaintiff's] litigation history is not relevant to this case." *Daniels v. Arcade, L.P.*, 477 F. App'x 125, 130 (4th Cir. 2012) (where an ADA plaintiff's credibility was challenged due to his litigation history). "Regarding Defendants' 'predatory' disability litigants argument, the Court also declines to make a credibility determination based solely on the fact that Plaintiffs have filed numerous similar cases, absent evidence that such claims were fraudulent or otherwise made in bad faith." *Ramirez v. Sam's for Play Cafe*, 2013 WL 4428858, *8 (N.D. Cal. 2013), *citing, Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1168 (2010); see also *Kittok v. Leslie's Poolmart, Inc.*, 687 F. Supp. 2d 953, 958 (C.D. Cal. 2009) ("The fact that plaintiff and her counsel have filed multiple similar suits is of little import here if *this* case was meritorious.") (Emphasis in original).

　　"Plaintiff is not stripped of standing by virtue of the number of lawsuits he has filed." *Segal v. Rickey's Rest. & Lounge, Inc.*, 2012 WL 2393769 (S.D. Fla. 2012) (where the Court rejected the defense argument that the plaintiff was "perverting the ADA" by engaging in serial litigation); see also *Hoewischer v. Sailormen, Inc.*, 2012 WL 2865788 (M.D. Fla. 2012) (the Court noted that the plaintiff had filed 152 cases and discussed the nature of the "cottage industry" that had arisen, driven by attorney's fees and penalties but concluded that,

Motion for Attorney's Fees: Reply                          **Case No.** 5:15-CV-00002-JGB-SP

1   "Nonetheless, the Court looks at the merits of each case individually");

2   see also *Access 4 All, Inc. v. Boardwalk Regency Corp.*, 2012 WL 3627775,

3   *9 (D.N.J. 2012) (where the Court rejected criticisms aimed at a serial

4   litigator, "Defendants cite no case law defining the term 'professional

5   plaintiff.' They also cite no case law, and none has been uncovered, to

6   support the argument that a plaintiff who files multiple ADA cases is not

7   entitled to attorney's fees . . ..").

8       The plaintiff is undoubtedly on the lookout for businesses that

9   violate the law and discriminate against him, *i.e.*, fail to honor *his* civil

10  rights. He has sued many businesses for these blatant violations and,

11  presumably, will file many more. A business that has failed to provide

12  accessible facilities in direct violation of state and federal law does not

13  have a defense of "well, you have filed too many cases and, therefore,

14  you cannot assert your rights at my business." Plaintiff's counsel has tried

15  scores of these cases and evidence of other lawsuits are always excluded

16  as irrelevant and prejudicial.

17      In *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1039

18  -1040 (9th Cir. 2008), the trial court focused on the fact that the plaintiff

19  had "approximately sixty prior ADA suits," and expressed "concerns

20  about D'Lil's credibility focused particularly on her past ADA litigation"

21  and found that she was not a legitimate plaintiff because of this history.

22  *Id.* at 1040.  The Ninth Circuit reversed the trial court's ruling and held

23  that it was going to "reject the legal reasoning" despite the deference

24  normally owed to the district court. *Id.* at 1039. The Ninth Circuit first

25  pointed out the unique nature of ADA litigation and the public policy

26  interest and benefit in having a small number of "committed individuals

27  bring[ing] serial litigation advancing the time when public

28  accommodations will be compliant with the ADA." *Id.* at 1040. The

Ninth Circuit then held that, "Although we afford great deference to a district court's credibility assessments, on this record we cannot agree that D'Lil's past ADA litigation was properly used to impugn her credibility. Accordingly, because the district court focused on D'Lil's history of ADA litigation as a basis for questioning the sincerity of her intent to return to the Best Western Encina, we reject its purported adverse credibility determination." *Id.* at 1040.[1]

In the case of *Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (9th Cir. 2007), the Ninth Circuit noted that at trial, the defense introduced evidence of previous lawsuits to discredit the plaintiff:

> The defendant's strategy was to discredit Molski by exposing an ulterior motive for bringing suit: Molski and his lawyer Thomas Frankovich ("Frankovich") were purportedly in the business of tracking down public accommodations with ADA violations and extorting settlements out of them. On cross examination, Molski acknowledged that: he did not complain to any of Cable's employees about his access problems; he had filed 374 similar ADA lawsuits as of October 8, 2004; Frankovich had filed 232 of the 374 lawsuits; even more lawsuits had been filed since that date; Molski and Frankovich averaged $4,000 for each case that settled; Molski did not pay any fees to Frankovich; Molski maintained no employment besides prosecuting ADA cases, despite his possession of a law degree; Molski's projected annual income from settlements was $800,000; Molski executed blank verification forms for Frankovich to submit with responses to interrogatories; they had also filed lawsuits against two other restaurants owned by Cable's; they had filed a lawsuit against a nearby restaurant; and Sarantschin obtained up to 95% of his income from Frankovich's firm for performing investigations for ADA lawsuits.

*Id.* at 728. This was powerfully prejudicial stuff.  Although no one appealed the fact that this evidence was introduced at trial, the Ninth

---

[1] It also noteworthy that courts will not even compel discovery about past ADA litigation history because it lacks relevance. *Campbell v. Moon Palace, Inc.*, 2011 WL 3648562 (S.D. Fla. 2011) (rejecting the argument that past litigation history was relevant or that there even exists a serial plaintiff defense).

Circuit queried, "It is unclear why this evidence was admitted by the trial court under Fed.R.Evid. 401. The narrow issue in the case was whether Cable's failed to identify and remove architectural barriers. Although some of the above facts may be admissible witness impeachment evidence, most appear to be irrelevant or at least far more prejudicial than probative. See Fed.R.Evid. 403." *Id.* at fn. 3. In fact, this type of irrelevant evidence was so prejudicial that the jury returned a defense verdict that the Ninth Circuit had to overturn because there was "no evidence whatsoever for the jury's verdict." *Id.* at 734.

In summary, it is clear that a history of bringing meritorious ADA claims cannot be used to diminish rights, to suggest a lack of credibility, to impugn motives or to be used to cast aspersions on a plaintiff or his case. And it certainly does not provide a basis to deny rights to attorney's fees under state or federal law.

### D.     Plaintiff's Attorneys Act Properly in Representing the Plaintiff

Not only does the successful prosecution of the rights under the ADA require committed plaintiffs but it also requires attorneys who will take their cases.  "Indeed, were it not for the efforts of those attorneys willing to undertake the representation of ADA plaintiffs, there would be little, if any, enforcement of this landmark statute." *Hansen v. Deercreek Plaza, LLC*, 420 F.Supp.2d 1346, 1349 (S.D. Fla. 2006); *see also Kalani v Castle Village, LLC*, 13 F.Supp.2d 1359, 1377 (E.D. Cal, 2014) ("This court is aware of no authority nor any basis in common sense that would allow it to sanction plaintiff's counsel because she has developed a specialty, litigated many cases within that specialty, represented the same client on multiple occasions, and gone to trial on at least one of those cases. Indeed, it is likely that counsel's specialization has made her

---

11

aware of controlling Ninth Circuit cases in this area. Defendants, meanwhile, have shown no awareness of at least two of these authorities . . ..").

## II.   THE DEFENSE FAILS TO IDENTIFY ANY BASIS TO REDUCE THE REQUESTED HOURLY RATES

The defense argues that plaintiff's counsel's senior attorney's requested hourly rates should be reduced to $300 per hour. The defense does not submit any evidence of a market rate or explain why this Court's previous determinations about plaintiff's counsel's hourly rates were wrong. Instead, the defense submits three arguments: (1) that the plaintiff's hourly rates are not based on what fee paying client's pay; (2) that the defense counsel's hourly rates are only $300; and (3) that plaintiff's counsel uses a lot of boilerplate material. Plaintiff will discuss each point.

### A.   Market Rates

The defense argues that the plaintiff's requested hourly rates are not reasonable because they are not what paying clients would pay. First, the *factual* claim is sheer speculation. The defense submits no evidence to demonstrate that paying clients would not pay these rates for these attorneys. Second, the argument lacks legal merit under both state and federal law. Regardless of how the attorney bills – or does not bill – the reasonable market value of the attorney's services is the measure of a reasonable hourly rate. *PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1094 (2000). This standard applies regardless of whether the attorneys claiming fees *charge nothing for their services*, charge at below-market or discounted rates, represented the client on a straight contingent fee basis,

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

1   or are in house counsel. *Id.*; *see also Welch v. Metropolitan Life Ins. Co.*, 480
2   F.3d 942, 946 (9th Cir. 2007).

3       Moreover, courts have expressly rejected the defense argument.
4   Rates awarded to the claiming attorneys in previous actions are good
5   evidence of the appropriate market rate. *See e.g. Margolin v. Regional*
6   *Planning Comm'n*, 134 Cal.App.3d 999, 1005 (1982) (where the court
7   rejected defendants' argument that rates awarded plaintiff's counsel in
8   prior litigation were not relevant, stating that court awards are "obviously
9   relevant" and that the "most analogous evidence" would be fees sought
10   and deemed reasonable by courts in other cases."). Also, in *United*
11   *Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir.
12   1990), the court held, "rate determinations in other cases, particularly
13   those setting a rate for the plaintiffs' attorney, are satisfactory evidence of
14   the prevailing market rate.". In *Hansen v. Deercreek Plaza, LLC*, 420
15   F.Supp.2d 1346, 1350 (S.D. Fla 2006), the court held that previous fee
16   rulings for the fee applicant for comparable cases is "satisfactory
17   evidence" in an ADA case.  In contrast, the defense cites no authority to
18   support its argument.

19

20   **B.**    **Defense Counsel's Fees**
21       With respect to defense counsel's argument that he has a lower
22   hourly rate and billed less, the argument lacks merit. First, defense
23   counsel does not specialize in disability civil rights litigation and has no
24   special expertise in the area and would not expect to command a rate as
25   high as plaintiff's attorneys in these cases. Furthermore, it is a "flawed
26   approach" to compare a losing defendant's litigation model (time billed,
27   choices made) "as a benchmark for evaluating the conduct of plaintiff's
28   attorneys." *Chabner v. United of Omaha Life Ins. Co.*, 1999 WL

Motion for Attorney's Fees: Reply           **Case No.** 5:15-CV-00002-JGB-SP

33227443, *3 (N.D. Cal. 1999). The *Chabner* court noted that the plaintiff is differently situated than the defense and has different challenges which, "include the burden of proof, the relative difficulty of obtaining access to essential information, and the chance that a given case may have greater precedential value for one side than the other." *Id.* Also, the Court noted that, "Finally, defendant lost this case, so defendant's approach does not recommend a model for conducting litigation." *Id.*

### C.    Boilerplate Material

Whether or not plaintiff's attorneys use templates or boilerplate material has no relevance to the hourly rate. Instead, it is relevant to the actual time billed on projects and plaintiff will address the arguments under those headings.

### III.   THE DEFENSE ARGUMENT ABOUT PROPORTIONALITY HAS BEEN REJECTED BY THE COURTS

The defense argues that the fees should be diminished because the amount of the award was only $4,000 while the fees requested are close to $30,000. Defense Brief, p. 8, lines 16-17. The Supreme Court has weighed in on this subject and flatly rejected such a proportionality test. In *City of Riverside v. Rivera*, the Court rejected a rule of proportionality that would have limited attorney's fee awards to a proportion of the damages recovered in the underlying suit and endorsed instead a flexible approach to lodestar calculations that takes into account all considerations relevant to the reasonableness of the time spent. *City of Riverside v. Rivera*, 477 U.S. 561, 578 (1986) ("A rule of proportionality

14

would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. This is totally inconsistent with Congress' purpose . . ..”). The Ninth Circuit has not been reluctant to follow the *Rivera* holding.  *See*, *e.g.*, *Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir.1996) (where the plaintiff was awarded $17,500 in compensatory damages and the *Morales* court held, as a matter of law, that this verdict was sufficient to justify an award of attorneys' fees and costs totaling nearly $140,000).  A more recent decision has a thorough and excellent discussion of the issue, under the heading: “The amount of damages recovered cannot serve as a cap or limitation on fees, especially in cases involving injunctive relief.” *Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1076 (N.D. Cal. 2010).

## IV.   THERE IS NO BASIS FOR A NEGATIVE MULTIPLIER

The defense argues that after reaching the lodestar, the Court should consider the *Kerr* factors to reduce the fees. Defense Brief, p. 6, lines 12-13. This argument demonstrates a misunderstanding of the law.

It is important to consider the historical development behind lodestar/*Kerr* factors. Before *Hensley v. Eckerhart*, 461 U.S. 424 (1983), a reasonable attorney fee award was determined by reference to the so called “*Johnson* factors”[2] which were specifically referred to in the Senate Report on the Civil Rights Attorney's Fee Awards Act of 1976 (the statute enacting Section 1988), S. Rep. No. 94-1011 (1976), reprinted in 1976 U.S.C.C.A.N. 5908. The Ninth Circuit adopted them in the case of *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). At the time that section 1988 was adopted, however, there was another method of

---

[2] From *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

calculating reasonable fees and this involved simply multiplying the number of hours reasonably expended by the reasonable hourly rate, reaching a "lodestar." *Gomez v. Gates*, 804 F.Supp. 69, 72 (C.D. Cal. 1992). In *Hensley*, the Supreme Court attempted to reconcile these two strands of analysis, holding that the lodestar is "[t]he most useful starting point for determining the amount of a reasonable fee." *Hensley*, 461 U.S. at 433. And while the Supreme Court noted that a district court may continue to consider the *Johnson-Kerr* factors, "it should note that many of these factors usually are subsumed within the initial calculation of hours reasonable expended at the reasonable hourly rate." *Id.* at 434, fn. 9.

If the Court were to adjust the lodestar downward based on *Kerr* factors, it would be applying a negative multiplier. Multipliers are rare. Negative multipliers are even rarer and amount to a penalty of sorts. "[A] positive multiplier is a recognized procedure that may be warranted by the importance of a case or the unusual excellence of representation. However, there is no parallel authority for the imposition of a negative multiplier. While the enhancement of a § 1988 award may be seen as a "bonus," . . . a negative multiplier can only imply some type of penalty." *Lynch v. City of Milwaukee*, 747 F.2d 423, 429 (7th Cir. 1984).

The case of *Thayer v. Wells Fargo Bank, N.A,*. 92 Cal. App. 4th 819 (2001) is an example of when a negative multiplier is appropriate under California law. But a review of the holding and reasoning in *Thayer* demonstrates that the present case is nothing like *Thayer*. In *Thayer*, the defendants "never disputed plaintiffs' factual or legal claims and promptly capitulated after the mere filing of the complaints." *Id.* at 839. In the present case, of course, the defendants did the opposite. They refused to offer a single penny for settlement, completely denied the

1    plaintiff's claims, and litigated the case through dispositive motion. In
2    *Thayer*, although the defense had capitulated at the earliest stages, the
3    plaintiff's attorneys still litigated the case unreasonably. In contrast, the
4    defendants in the present case never capitulated, never conceded a
5    violation of the plaintiff's civil rights, and adamantly declared they would
6    never settle.

7        The present case simply cannot be compared to the *Thayer* case or
8    any case where a negative multiplier was applied.

9        As the *Lynch* court explains, a prevailing civil rights action is
10   presumed to have significance and legal merit and, therefore, if a court is
11   going to reduce the lodestar in the fee award, it must provide a
12   quantifiable basis for its reduction:

13   > It is not helpful to think of a negative multiplier as simply the
14   > opposite of a positive multiplier. While there may be no
15   > upper limits on the significance of a case, or the skill
     > required to win it, the structure of § 1988 does provide
16   > lower limits. To qualify for an award under § 1988, there
     > must have been a legal cause of action based on a
17   > guaranteed civil right and one party or the other must have
     > prevailed. These conditions assure that there is a minimum
18   > degree of significance and legal merit. Therefore, we hold
     > that, **in all but the most unusual circumstances, any**
19   > **downward modification of the lodestar figure should**
     > **be for one of the enumerated factors and should be**
20   > **expressed in a dollar amount reflecting, as best as**
     > **possible, the market value associated with the specific**
21   > **defect**. If the circumstances should ever arise in which an
     > overall penalty should be assessed, the reasons for that step
22   > will have to be given with great detail and thorough
     > justification.

23   *Lynch*, 747 F.2d at 430 (emphasis added). In the present case, there is no
24   basis to shift the lodestar downward.

25

26

27

28

---

17

# V.  THE DEFENSE CRITICISMS OF INDIVIDUAL BILLING ENTRIES LACK MERIT

Defense counsel's vitriol and negative opinion of the plaintiff and his attorney has shaded his ability to analyze the billing entries fairly. The defense has 25 objections which he has put in a table in single line pleading and, therefore, there is an extensive amount of material to respond to. Plaintiff's counsel will discuss each objection.

## A.  Prefiling Meeting with the Client

Plaintiff's counsel billed a whopping 0.7 hours for prefiling meetings with the client. The defense cries foul and says that this is unreasonable and that only 0.2 hours is reasonable. Defense Table (ECF Entry 56-2), #1. The defense bases this claim on the fact that plaintiff's counsel and the plaintiff have a long working relationship. This is entirely true. Thus, there is only a total of 1.2 hours of meetings between plaintiff and his attorneys in the entirety of the billings. This demonstrates restraint and is reasonable. The defense argument that all cases are the same is just silly. Federal courts are courts of limited jurisdiction and plaintiff's counsel has to assure himself that the plaintiff has sufficient reason to want to return and patronize the defendant business in order to have standing for injunctive relief. The published case law over standing for remedial relief is extensive. It is a big fight and spending 0.7 hours to go over facts and prepare the case is hardly unreasonable.

## B.  Site Inspection

The defense argues that plaintiff's counsel should have visited three sites on the same day on December 11, 2014 and prorated it between three cases. Defense Table, #2. The defense does not say which

18

1  other two cases he is talking about and the plaintiff's counsel simply does

2  not know what he is talking about.

3

4  ### C.   Public Records Research

5  The defense argues that all that is needed to conduct the public

6  records research identified by the plaintiff is to conduct a computer check

7  on San Bernardino's County website and that this should only take 0.2

8  hours. Defense Table, #3. This argument is nonsense. Plaintiff's counsel

9  examines a number of databases to determine the proper parties and

10  their relationship to the property, including the California Secretary of

11  State's database (where he discovered that Gibson Brothers Janitorial

12  Service, Inc. was a suspended corporation), looking at the California

13  Board of Equalization records to determine if other operates are at the

14  site, property records to determine the responsible parties, to identify the

15  locations for service (since property owners and absentee landlords

16  cannot be served at the site), as well as the building permit records. And

17  when the building permit records are assessed, the must be assessed

18  critically with an understanding of the relevant law and triggering

19  obligations.  The defense has no idea what takes in place when an ADA

20  plaintiff's attorney conducts prefiling research.

21  When an existing facility is altered in a "manner that affects, or

22  could affect the usability of the facility or part thereof," the operator is

23  under an obligation to make the alterations "in such a manner that, to the

24  maximum extent feasible, [makes] the altered portions of the facility

25  readily accessible to and usable by individuals with disabilities, including

26  individuals who use wheelchairs." 42 U.S.C. § 12183(a)(2). Additional

27  requirements are imposed if the alterations are made to an area of the

28  facility containing a "primary function"--i.e., "a major activity for which

19

1   the facility is intended." 28 C.F.R. § 36.403(b). Alterations to the "path of

2   travel" need only be undertaken where they are "not disproportionate to

3   the overall alterations in terms of cost and scope." 42 U.S.C. §

4   12183(a)(2); *see* 28 C.F.R. § 36.403(f). The regulations provide that:

5   
6   [a]lterations made to provide an accessible path of travel to the altered area will be deemed disproportionate to the overall alteration when the cost exceeds 20% of the cost of the alteration to the primary function area.
7   

8   28 C.F.R. § 36.403(f)(1). Thus, it is clear that under 42 U.S.C. § 12183(b)

9   and under section 1134B.2.1 of California's Building Code, Title 24,

10  alterations that affect the usability of the facility trigger duties to make

11  accessible the "parking," that services such areas of alteration. In fact, up

12  to 20% of the cost of the project must be earmarked for improving

13  accessibility.   The statute also states:

14  
15  The obligations to provide access may not be evaded by performing a series of small alterations to the area served by a single path of travel if those alterations could have been
16  performed as a single undertaking.  If an area has been altered without providing an accessible path of travel to that area, and subsequent alterations of that area or a different
17  area on the same path of travel are undertaken within three years of the original alteration, the total cost of alterations to
18  the areas on that path of travel during the preceding three-year period shall be considered in determine whether the
19  cost of making that path of travel is disproportionate.

20  

21  Title 24 of the California Code of Regulations § 1134B.2.1 exception 1

22  (emphasis added).  Thus, the plaintiff must be prepared to present to the

23  trier of fact information about what was done, how much it cost, whether

24  several items were done within a three year period of time, and how much

25  money should have been spent on improving access. This public records

26  research is critical. Sometimes it results in gold, i.e., a slam dunk case.

27  

28  

---

20

### D.    Discovery

The defense also argues that because the plaintiff's discovery is built upon previously used templates, the 1.7 hours billed is unreasonable and only 0.5 hours is fair. Defense Table, #10. This lacks merit. While the plaintiff's discovery is, in fact, created from templates, it still takes time to modify those templates to address the claims, affirmative defenses, photographs, measurements and other items that are specific and unique to each case. It took plaintiff's counsel 1.7 hours and it typically takes between 1.7 and 2.4 hours to do this. Every time. The defense is involved in naked speculation and is wrong. Likewise, the defense speculation that only 1.7 hours instead of 2.8 hours for reviewing and analyzing (and sorting) the substantial discovery response from the defendants (Defense Table #54), updating the Trial Folder and so forth lacks any merit and relies on naked conjecture.

The defense complains about the time spent in drafting deposition notices. Defense Table #51 on the basis that no depositions were held. This argument lacks merit. Drafting the deposition notices were not unreasonable. The defense provided information that negated the need for the depositions and they were not held. That does not render the initial setting of them improper.

### E.    Opposing the Application for Stay

The defense filed a motion to stay the case. The plaintiff filed an opposition to that motion. ECF Entry 28. The defense says that almost no time should be billed because plaintiff's counsel should have known that the Court would sua sponte deny their motion without any need for an opposition. Defense Table, #13. This is just silly. Is the defense really claiming that it filed such a meritless and frivolous motion that any

Motion for Attorney's Fees: Reply                          **Case No.** 5:15-CV-00002-JGB-SP

1    competent attorney would just instinctively know that it could be
2    ignored? The plaintiff drafted the opposition before the Court's ruling
3    and merely because his staff filed moments after the court's ruling does
4    not change the fact that it was reasonable to work on this and avoid any
5    stay.

6

7    ### F.    Declarations of Witnesses

8          The defense objects to the time spent preparing Mr. Evens Louis'
9    declaration. Defense Table, #20. Mr. Louis is the investigator. The
10   defense mistakenly reads "Louis" as referring to "Love" and objects that
11   it should take no time at all to know the plaintiff's experience. The
12   defense also complains about the whopping 0.6 hours spent in a
13   discussion with expert witness Paul Bishop and then the 0.5 hours spent
14   in reviewing Bishop's Report and discussing that with him. Defense
15   Table, #21 & 22. The defense argues that this work with the expert
16   should only take a total of 0.4 hours. This is just silly. Either the defense
17   has never worked with experts or the defense is intentionally being
18   unfair. The defense complains about the 0.5 hours working with the
19   plaintiff on his declaration. The defense says the proper charge is 0.3
20   hours. Defense Table, #26. Likewise, the defense claims that 0.4 hours
21   for the meeting with the expert on 9/10/15 should be 0.2 hours. The
22   defense claim to super knowledge and ability to scalpel out 0.2 hours of
23   work with no clue about those conversations is amazing.

24

25   ### G.    Legal Briefs

26         The complains about the 10 hours spent working on the opposition
27   to the defense MSJ. Defense Table, #23-24. Likewise the 4.2 hours spend
28   in drafting the plaintiff's motion for summary judgment and the 6.4 hours

spent drafting the reply brief. Defense Table #30, 33. The defense argument is just a snide commentary about how long it should have taken without any justification. Plaintiff's counsel is good at what he does but it takes time to develop tight arguments that read well for the Court. Plaintiff's counsel bills what it takes and his billing is fair.

### H.    Plaintiff's Fee Motion

The defense complains that spending 2.2 hours drafting the free motion is too much. That it should have taken only 1.8 hours. Defense Table #39. The defense does not explain how it can possible make this 0.4 hours distinction. The defense argues that plaintiff has drafted these fee motions before. This is true. Plaintiff's fee motion, if drafted from scratch, would take a couple days. It is chocked full of legal analysis. But it still takes a couple hours to modify an existing template to fit the facts of the case. Plaintiff's counsel has to scrutinize the billing to redact any unfair or repetitive billing as well as any attorney-client privileged material. Plaintiff's counsel has to choose the emails from the many communications that properly demonstrate the parties' respective positions. Moreover, plaintiff's counsel has to go over the entire case to brief the court on the settlement history and negotiations. That is unique to every case. All of this takes time.

### I.    Reply Brief

The defense argues that the entire 10 hours for estimated time for this reply brief and the travel to oral argument should be discounted because it has not been incurred yet. Defense Table #40. The defense acknowledges that this estimate can be amended to state the actual hours. Plaintiff's counsel underestimated the time necessary. The defense

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP

brief is such a vicious attack on the character and morals and motivations of plaintiff and his counsel and levies so many erroneous statements of fact and law that this reply brief has turned into a whopper of a brief and taken 14.3 hours over two working days. And this is without the time spent on travel or oral argument.

Undoubtedly the plaintiff missed some objection. That is unintentional and should not be considered a concession.

## VI.   CONCLUSION

The plaintiff respectfully requests that his motion be granted and he be awarded $29,457.50.

Dated: November 23, 2015          Center for Disability Access
                                           /s/ Mark Potter
                                  By:_____
                                  Mark Potter, Esq.
                                  Attorneys for Plaintiff

Motion for Attorney's Fees: Reply                    **Case No.** 5:15-CV-00002-JGB-SP